## UNITED STATES v. DUPEE et al.
### No. 3269.

District Court, D. Massachusetts.

Nov. 23, 1931.

A. Chesley York, Asst. U. S. Atty., and Frederick H. Tarr, U. S. Atty., both of Boston, Mass.

Joseph F. Lockett, of Boston, Mass., for defendants Farnsworth and Talmage.

BREWSTER, District Judge.

The respondents Dupee, Meadows & Bradlee are in possession of a sum of money which is claimed by the complainant and also by the respondents Farnsworth & Talmage. This proceeding in equity is brought for the purpose of adjudicating the rights of the adverse claimants in this fund.

## Statement of Facts.

The firm of Dupee & Meadows, the predecessors of Dupee, Meadows & Bradlee, were importers of wool before and during the World War. Farnsworth & Talmage was a partnership formed for the purpose of entering into war contracts with the United States for the sale of the product of two mills engaged in the manufacture of wool blankets. It appears that Farnsworth & Talmage also purchased the raw materials entering into the products to be manufactured under these contracts with the government.

In December, 1917, the War Industries Board, a subordinate agency of the Council of National Defense, established under the Act of August 29, 1916 (39 Stat. 649, § 2 [50 USCA §§ 1–4]), made a ruling which required importers of wool to obtain a license, and no licenses were granted unless the importer gave the Quartermaster General an option to take over the wool on arrival at a United States port at a price to be fixed by the authorities.

Farnsworth & Talmage had been carrying on negotiations with the Navy Department and had been assured of contracts which would, in all probability, take the full output of the manufacturers, and, in order to prepare for the execution of these contracts, they had contracted to buy large quantities of wool from Dupee & Meadows at stipulated prices which were to include carrying charges, such as interest, storage, insurance, etc.

Farnsworth & Talmage entered into three contracts for manufacturing and delivering blankets to the United States Navy. They were No. 36184, dated March 29, 1918 for 66,800, No. 37744, dated June 14, 1918, for 194,200, and No. 42731, dated October 19, 1918, for 150,000, blankets. When the first contract was entered into, Farnsworth & Talmage had on hand, or available, wool already imported to the amount of 705,000 pounds (hereinafter referred to as free wool). They had contracted for 862,084 pounds of other wool which had not then been imported, and which, when imported, would come in subject to an option in favor of the government. (This wool will be hereinafter referred to as government wool.)

In order to facilitate the importation and delivery of this government wool to Farnsworth & Talmage, Mr. Albert W. Elliott, the Chief of the Wool, Top and Yarn Branch of the Supply and Equipment Bureau of the Quartermaster Corps, devised a plan which was submitted to and approved by both Farnsworth & Talmage and Dupee & Meadows. This plan is set forth in detail in a communication under date of May 3, 1918, addressed to the Wool Administrator, Charles J. Nichols, as follows:

"2. The Bureau of Supplies & Accounts is very anxious that this wool should eventually find its way into the hands of the mills, who are to manufacture the blankets under their contract with Talmage & Farnsworth, and we have assented to the proposition.

"3. However, when these wools arrive they should be valued as belonging to Messrs. Dupee & Meadows, who appear as the direct importers, and then should be allotted to Messrs. Talmage & Farnsworth and shipped as they may direct.

"4. The difference in price, if any, between the price at which the wool was sold by Messrs. Dupee & Meadows to Messrs. Talmage & Farnsworth, and the valuation placed on the wool by the committee should be collected in cash from Messrs. Dupee & Meadows and checks in payment of this difference should be sent to the Bureau of Supplies & Accounts, Navy Department, for the attention of Mr. Hancock or Mr. Kane.

"5. In other words, Messrs. Talmage & Farnsworth will pay the full price at which they had bought the wool to Dupee & Meadows, but Dupee & Meadows will rebate the difference to your department, and this difference will be paid to the Navy Department."

In a letter to the Purchase Division of the Navy, Bureau of Supplies and Accounts, dated July 19, 1918, Farnsworth & Talmage, referring to the valuation placed on the government wool, stated: "The method outlined in Art. 4 of Mr. Elliott's letter of May 3rd establishes the principles that will control the transaction."

This letter also contains the following paragraph: "(f). The completion of the contracts by delivering the articles on time and, in cases of emergency, ahead of time, it seems to us is the matter of first importance, and, with this purpose in view, may we not be permitted to suggest the wisdom of in every way facilitating the carrying out of the provisions of the contract by first aiding Dupee & Meadows to obtain all of the wools purchased for our account and then to help them deliver the wools as required by our mills? The amount that will accrue to the Navy by reason of the observance of Mr. Elliott's ruling can be ac-

curately and conscientiously accounted for and *paid over to the Navy,* and we hope without the introduction of any interruptions to the present satisfactory method of handling and shipping, which has proven so effective thus far, and we earnestly commend to your favor the adoption of the details outlined above, which will admit of the full observance of Mr. Elliott's decree." (Italics supplied.)

Dupee & Meadows proposed on October 17, 1918, to remit the difference between the government valuation and contract price at which the wool had been sold to Farnsworth & Talmage as fast as the various lots were paid for. The Navy, however, wrote Dupee & Meadows that they preferred to make only one settlement for the entire amount, and suggested that they account after the wool had all been delivered, together with interest at the rate of 6 per cent. from the time the several amounts became due.

This proposition was not acceptable to Dupee & Meadows, and later, on November 2, the Navy Department addressed the following communication to Dupee & Meadows:

"It is probable that a new method of applying the amount due the Navy by reason of re-valuation of wool used by Farnsworth & Talmage in Navy contract 36184 will be followed whereby this amount, when finally determined, will be applied to reduce the cost to the Navy of the blankets on Navy contract 36184.

"Information is requested whether it will now be agreeable to Messrs. Dupee & Meadows to hold without interest, all sums as they become due the Navy until the final settlement can be made. This would assist the Navy in making final disposition of this money when settlement with Farnsworth & Talmage for the contract is actually made."

In reply to this letter, Dupee & Meadows agreed to await final delivery before adjusting with the government, and very generously agreed to account for interest at the rate of 4¼ per cent.

Inasmuch as the contract prices which were paid for the government wool by Farnsworth & Talmage included interest and storage, and the prices fixed by the government did not, it was agreed between Dupee & Meadows, the government, and Farnsworth & Talmage, that Dupee & Meadows might deduct proper charges for storage from whatever sums might be due the Navy on account of the difference between the government price and the contract price, and that Farnsworth & Talmage would assume the interest charges. Dupee & Meadows deducted $9,296.20 for storage, and made an additional charge of about $24,000 for interest, which Farnsworth & Talmage paid. As Dupee & Meadows received payments from Farnsworth & Talmage for the several lots, they set apart and held pursuant to their agreement with the Navy Department the difference between the price received for the wool and the price fixed by the appropriate War Board, less storage charges.

Payments for government wool were made during the period from November, 1918, to July, 1919. Dupee & Meadows, subsequent to the last payment, submitted a statement as of January 1, 1920, showing an amount due the government of $11,-478.37, which sum, with the accumulated interest at the rate of 4¼ per cent., constitutes the fund in controversy. There is no dispute between the government and Dupee & Meadows as to the correctness of this balance.

An event not contemplated by the parties was the sudden termination of the war, which left Farnsworth & Talmage with about 65 per cent. of the government wool on hand and 20,639 blankets to be delivered under the outstanding contract No. 42731, when it was canceled without liability. This constituted about 5 per cent. of the total number of blankets contracted for.

On July 12, 1920, Farnsworth & Talmage entered into an agreement in the nature of an accord and satisfaction, pursuant to which Farnsworth & Talmage paid to the government $22,934.95. This amount appears to have been the balance due after deducting from advances made on contracts not involved in this litigation the sum that was due Farnsworth & Talmage for the blankets and materials delivered, amounting to over $125,000. This so-called supplemental agreement to contract (42731) contained the following clause: "It is the purpose of this supplementary agreement to accomplish the complete fulfillment of the aforementioned contracts and the payment to the Navy by the contractors of $22,934.95 in accordance with the foregoing statement, fulfills and discharges all and each of the mutual obligations of both parties to said contracts and the party of the second part accepts same in full satisfaction of any and all liabilities of the party of the first part."

When this settlement was reached, no

reference was made by any one to the fund in the hands of Dupee & Meadows, and it was not until some time in 1927 that the respondents Farnsworth & Talmage first made any claim to it.

### Conclusions of Law.

The respondents Dupee, Meadows & Bradlee have allowed the complainant to take the bill · as confessed against them. They are ready to pay over the fund to the complainant if it should be adjudicated that the respondents Farnsworth & Talmage are not entitled to it. The sole question, therefore, is whether the asserted claim of Farnsworth & Talmage to the fund has any legal basis, or is one that can be recognized in a court of equity.

It is a significant fact that over seven years elapsed after the creation of the fund before it was ever suggested by these respondents that they had any rights whatever in it.

That the original arrangement between the Navy and Dupee & Meadows created a fund for the sole benefit of the United States is clear. The purpose of the arrangement is readily understood. Farnsworth & Talmage had contracted to manufacture and sell to the Navy blankets at prices which were based on the cost of wool to them, computed at prices which they had agreed to pay to Dupee & Meadows, and they had contracted to buy 862,084 pounds of wool which was subject to the regulations of the War Industries Board. To expedite the delivery of this wool, the authorities refrained from exercising an option to purchase the wool under these regulations, in order that Dupee & Meadows might sell direct to Farnsworth & Talmage at the prices stipulated in the several contracts to purchase which were outstanding between Farnsworth & Talmage and Dupee & Meadows. This action on the part of the government was taken with the distinct understanding that, if the contract prices received by Dupee & Meadows for this government wool were higher than the valuation fixed by the Wool Administration, Dupee & Meadows would account to the complainant, and to no one else, for the difference by which the contract prices exceeded the fixed prices, less storage charges. No other construction can possibly be put upon this agreement. Farnsworth & Talmage were not parties to the agreement, although they were asked to, and did, approve its terms. That they fully understood that the fund was to be held for the benefit of the Navy is put beyond any doubt by their own letters, both to the Navy and to Dupee & Meadows.

As I understand it, they now contend that this arrangement was later modified so they, instead of the United States, became the beneficiary of the fund. I find no evidence, written or oral, to sustain any such contention. Stress is laid upon the letter of November 2, 1918, from the Paymaster General to Dupee & Meadows, which intimated that a new arrangement might be made. The meaning of that letter is not at all ambiguous. It meant nothing more than that, when the amount of the fund had been finally determined, the aggregate of the sums set aside, with the accrued interest, might be used in the final settlement with Farnsworth & Talmage. It may be that it was then contemplated that, in the event of such application, the fund would be paid by Dupee & Meadows to Farnsworth & Talmage, and such payment would, of course, have been deducted from whatever might have been found due from the United States to these respondents at the time of such settlement. But, when the settlement was made, in July, 1920, it happened that Farnsworth & Talmage were owing the United States, so that no occasion arose for any such application, and, of course, it was not made, and there was at the time of the settlement no suggestion by any one that the fund should be turned over to Farnsworth & Talmage.

It is further suggested that in equity and good conscience the fund should be paid to Farnsworth & Talmage, inasmuch as they paid some $24,000 by way of interest, thus increasing the cost to them of the government wool. According to the evidence, this additional charge was for "extra dating" and was a charge they agreed to assume. If the government agreed to reimburse them, no reliable evidence has been forthcoming to show any such agreement, and, if it existed, the government's liability under it must have been extinguished by the agreement of July 12, 1920.

Nor is there any merit in the contention of these respondents that, inasmuch as only 35 per cent. of the government wool actually went into the manufacture of the blankets delivered to the Navy, only a like percentage of the fund should be paid to the complainant. The understanding between the Navy and Dupee & Meadows related not to blankets, but to a specific quantity of wool to be imported and sold direct to Farnsworth & Talmage, without the ne-

cessity of complying with regulations regarding governmental evaluation. I have no doubt that everybody involved expected that all of this government wool would be used in the fulfillment of contracts then existing, or thereafter to be entered into, between Farnsworth & Talmage and the government, for the sale and delivery of Navy blankets, but, if more wool was purchased than was needed for that purpose, it was a risk which Farnsworth & Talmage assumed. If they used free wool in the manufacture of blankets instead of the government wool, they must be held to abide the consequences of their choice. It appears from correspondence between the Navy and Farnsworth & Talmage that the last contract, No. 42731, was canceled before all the blankets had been delivered, without liability for damages due to the failure of Farnsworth & Talmage to deliver in accordance with the terms of the contract. Whatever loss or damage to Farnsworth & Talmage may have resulted from this cancellation was satisfied in the final adjustment of July 12, 1920. None of these circumstances can tend in the slightest degree to modify the arrangement between the Navy and Dupee & Meadows.

In conclusion, I find that the respondents Farnsworth & Talmage have no right, title, or interest, legal or equitable, in and to the money now held by the respondents Dupee, Meadows & Bradlee, and that the government is entitled to receive the same, with interest at the rate of $4\frac{1}{4}$ per cent. to date of payment, and a proper decree may be entered to that end. The United States attorney may submit a form of decree for my approval.